**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------- X

PETERSEN-DEAN, INC.,

                  Petitioner,

    -against-

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA.,

                  Respondent.

--------------------------------------------------------------- X

**ORDER DENYING PETITION**
**TO VACATE ARBITRAL**
**AWARD AND GRANTING**
**CROSS-PETITION TO**
**CONFIRM AWARD**

19 Civ. 11299 (AKH)

ALVIN K. HELLERSTEIN, U.S.D.J.:

        Petitioner Petersen-Dean, Inc. ("Petersen") filed this action on December 10, 2019 under the Federal Arbitration Act ("FAA"), seeking vacatur of a prehearing security award issued by a three-arbitrator panel against Petersen and in favor of Respondent National Union Fire Insurance Company of Pittsburgh, PA. ("National Union"). Petersen contends that the panel "exceeded [its] powers" in granting the award, in contravention of 9 U.S.C. § 10(a)(4). National Union filed a cross-petition on January 8, 2020 to confirm the arbitral award. For the following reasons, Petersen's petition to vacate the prehearing security award is denied, and National Union's cross-petition to confirm the award is granted.

**Background**

        The arbitration that underlies this action concerns a longstanding dispute between Petersen and National Union as to amounts allegedly owed by the former to the latter under a number of insurance contracts. The following facts—which derive from the parties' submissions in connection with the instant petition and cross-petition—are not in dispute.

A. The Agreements

    1. The Payment Agreement

In 2003, National Union and nonparty Vaca Valley Roofing, Inc. ("Vaca Valley") entered into an agreement (the "Payment Agreement"), which, as amended, requires Vaca Valley to, *inter alia*, make various insurance-related payments to National Union. *See* Payment Agmt., ECF No. 7-8. As explained *supra*, the instant petition centers around the parties disagreement as to certain key terms in the Payment Agreement.

The Payment Agreement requires Vaca Valley to fulfill a "Payment Obligation," defined as "the amounts that [Vaca Valley] must pay [National Union]" for insurance and other services specified in the Payment Agreement and other ancillary agreements—irrelevant here— between those two parties. *Id*. at 4. The "Payment Obligation" further specifies that "amounts" covered by its definition "include, *but are not limited to*," a number of listed obligations, such as "premiums and premium surcharges" and "fees, charges, or obligations" shown in a "Schedule" appended to the Payment Agreement. *Id*. (emphasis added).

In a section entitled, "What about collateral?", the Payment Agreement states that "Collateral is Required," elaborating as follows:

> You must deliver collateral acceptable to [National Union] to secure Your Payment Obligation at the time(s), in the form(s) and in the amount(s) shown in the Schedule.

*Id*. at 6. The section then goes on to grant National Union the right to periodically review the "collateral [it] require[s]" from Vaca Valley:

> The collateral we require to secure Your Payment Obligation is subject to reviews and revisions as described below. . . .
>
> [W]e may review our collateral requirement at any time that we may deem reasonably necessary . . . .
>
> If as a result of any review we find that we require additional collateral, You will provide us such additional collateral within 30 days of our written request . . .

*Id*. at 6.

Finally, the Payment Agreement contains a dispute resolution provision that

requires disputes be submitted to arbitration, and fixes the scope of the arbitral panel's authority:

> Any . . . unresolved dispute arising out of this Agreement must be submitted to arbitration.
>
> . . . .
>
> The arbitrators must interpret this Agreement as an honorable engagement and not merely a legal obligation. They are relieved of all judicial formalities. They may abstain from following the strict rules of law. They must make their award to effect the general purpose of this Agreement in a reasonable manner. . . .
>
> The arbitrators may . . . order You to provide collateral to the extent required by this Agreement.

*Id.* at 8-9. This provision states that while the parties are generally required to split the expenses

needed to pay the arbitrators, failure of a party to fulfill its duties under the Payment Agreement

will give rise to cost-shifting:

> If You or we fail to perform or observe any provisions under this Agreement, the other may incur reasonable additional expenses to enforce or exercise its remedies. Either You or we must reimburse the other upon demand and presentation of clear and convincing supporting evidence . . .

*Id.* at 9.

2. The Assumption Agreement

In January 2009, Petersen and National Union entered into an agreement (the

"Assumption Agreement") whereby Petersen assumed the rights and obligations of Vaca Valley

under the Payment Agreement. *See* Assumption Agmt., ECF No. 7-9.[1]

---

[1] In its petition, Petersen includes the proviso that it "does not admit that it assumed such obligations [under the Assumption Agreement] and in any event disputes the scope of such obligations in the arbitration." Petition ("Pet."), ECF No. 1, at 2 n.2. For present purposes, Petersen does not recapitulate this argument in support of its vacatur request. As such, the Court—for now—delineates the facts as though Petersen had fully assumed Vaca Valley's duties, and does not venture to decide the breadth of Petersen's Assumption Agreement obligations.

## B. Arbitration Proceedings

### 1. Relief Requested

In September 2018, National Union served Petersen with an arbitration demand, alleging that Petersen had failed to make payments owed under the Payment Agreement. That July, National Union moved for a prehearing security award of $27,521,996 "to secure a final award of the outstanding balance [of payments] due to National Union." Mot. for Prehearing Security, ECF No. 7-2, at 1. National Union's motion emphasized Petersen's major financial difficulties, *see id.* (mentioning Petersen's "lack of liquidity," "refusal to pay a single penny to National Union for nearly seven years," and "lack of tangible assets"), and concluded "[i]t would be patently unfair . . . to require National Union to continue to litigate this dispute without being fully secured." *Id.* at 2. Petersen conceded that the Payment Agreement empowered an arbitral panel to give interim security to National Union, but opposed the motion, arguing in part that it lacked the ability to obtain the $27.5 million, and that payment of this amount would "destroy [its] business." Opp. to Prehearing Security, ECF No. 7-3, at 2.

### 2. Oral Argument

In August 2019, a three-arbitrator panel held oral argument on National Union's motion. *See* Oral Arg. Tr., ECF No. 7-5. The 85-page transcript of that argument is replete with discussion of Petersen's financial condition and National Union's claim that a prehearing award was needed to ensure any eventual award remain "meaningful." *See, e.g., id.* at 9:2-5 (National Union: "The point of pre-hearing security is to prevent an arbitration award from becoming a nullity because a party is unable to pay a final award."); 16:4-8 (Petersen: "[T]he objective that the panel should be looking at is ensuring fundamental fairness of the proceeding and ensuring that ultimately an award would be, quote, meaningful."). At the hearing, National Union also

4

clarified that it did not "want Petersen[] to go into bankruptcy," and that if Petersen were to "say look, we're willing to put up X, not $27 million," that National Union would consider this route. *Id.* at 52:11-12. But in any case, National Union asserted that "[p]roceeding through discovery and a final hearing would be silly" because "[i]t would waste everyone's time and resources, and it would create a situation where National Union only has downside because, if it succeeds on its claims, it can't recover after spending hundreds of thousands of dollars pursuing an enforceable judgment." *Id.* at 9:14-16.

Petersen, for its part, conceded once more that "[t]he panel ha[d] authority to issue pre-hearing security," but urged that such security *should not* be awarded because it would force Petersen "to go through a bankruptcy." *Id.* at 69:2-13. The panel, throughout the hearing, probed the extent of Petersen's financial distress, and pressed Petersen's counsel on whether it would be equitable to deny security and risk National Union's inability to recover:

> So why would the panel countenance taking the parties through an exceptionally fact-intensive and costly hearing if there's a possibility that at the end of the day there is no way for you to satisfy an award? Isn't that the purpose of pre-hearing security?

*Id.* at 68:9-15.

### 3. Prehearing Award

On September 12, 2019, the panel issued an order granting National Union's motion for prehearing security "in the amount of $2 million." Administrative Order, ECF No. 7-1, at 1. The panel explained that the order was "intended to secure for [National Union] the costs of pursuing the arbitration in light of the [Petersen's] self-proclaimed financial difficulties." *Id.* In December 2019, Petersen moved for the panel to vacate the award, *see* Mot. to Vacate, ECF No. 7-7. The panel denied this request less than a week later. *See* Administrative Order, ECF No. 18-2, at 1. Petersen filed the instant petition in this Court on December 10, 2019.

## Discussion

Federal courts "accord a high degree of deference to an arbitrator's decision."

*187 Concourse Associates v. Fishman*, 399 F.3d 524, 526 (2d Cir. 2005); *see Banco de Seguros*

*Del Estado v. Mut. Marine Office*, 344 F.3d 255, 260 (2d Cir. 2003) ("The scope of the district

court's review of an arbitral award is limited."). Thus, an arbitration award

> must be upheld when the arbitrator offers even a barely colorable justification for
> the outcome reached. . . . As long as the arbitrator is even arguably construing or
> applying the contract and acting within the scope of his authority, that a court has
> committed serious error does not suffice to overturn his decision.

*187 Concourse*, 399 F.3d at 526 (quotations and alterations omitted). If "arbitrators exceed[]

their powers," a court may vacate the award, 9 U.S.C. § 10(a)(4), but this Circuit has "accorded

the narrowest of readings to the FAA's authorization to vacate awards pursuant to § 10(a)(4),"

*Banco de Seguros*, 344 F.3d at 262 (quotations omitted). The party "moving to vacate an . . .

award has the burden of proof, and the showing required to avoid confirmation is very high."

*D.H. Blair & Co., Inc. v. Gottdeiner*, 462 F.3d 95, 110 (2d Cir. 2006). Vacatur is proper "only if

the arbitral award contradicts an express and unambiguous term of the contract . . . or if the

award so far departs from the terms of the agreement that it is not even arguably derived from the

contract." *Harper Insurance Limited v. Century Indemnity Company*, 819 F.Supp.2d 270, 276

(S.D.N.Y. 2011) (quotations omitted). In considering a § 10(a)(4) challenge, "the principal

question . . . is whether the arbitrator's award draws its essence from the agreement to arbitrate."

*ReliaStar Life Ins. Co., N.Y. v. EMC Nat. Life Co.*, 564 F.3d 81, 85 (2d Cir. 2009) (quotations

omitted); *accord Harper*, 819 F.Supp.2d at 276.

When "an arbitration clause is broad, . . . arbitrators have the discretion to order

remedies they determine appropriate, so long as they do not exceed the power granted to them by

the contract." *ReliaStar*, 564 F.3d at 85. Of acute relevance here, courts are not to "undermine

6

the comprehensive grant of authority to arbitrators by prohibiting an arbitral security award that ensures a meaningful final award." *Banco de Seguros*, 344 F.3d at 262. Indeed, the "arbitrator's rationale for an award need not be explained, and the award should be confirmed if a ground for the arbitrator's decision can be inferred." *D.H. Blair*, 462 F.3d at 110 (quotations omitted); *id.* ("Only a barely colorable justification for the outcome reached by the arbitrators is necessary to confirm . . .") (quotations omitted). The "strict limit on [the] . . . power to vacate is intended to facilitate the purpose underlying arbitration: to provide parties with efficient dispute resolution, thereby obviating the need for protracted litigation." *In re Arbitration Between General Security Nat. Inc.*, 785 F.Supp.2d 411, 418 (S.D.N.Y. 2011) (quotations omitted).

Applying these principles, and mindful of the "extremely deferential standard of review" owed to arbitration awards, *Jock v. Sterling Jewelers Inc.*, 942 F.3d 617, 622 (2d Cir. 2019), there can be no doubt that the arbitral prehearing security award here was proper.

The key question in reviewing claimed 9 U.S.C. § 10(a)(4) violations is whether an arbitrator's award draws its "essence" from the agreement to arbitrate, *ReliaStar*, 564 F.3d at 85, so I begin our quest by divining the Payment Agreement's essence. A number of features of the Payment Agreement indicate that the parties intended to convey broad and flexible authority to the panel; that the parties specifically conferred upon the panel the ability to award prehearing security; and that the parties contemplated the possibility of expense-shifting in the event of one party committing a breach. First, the Payment Agreement includes an "honorable engagement" clause, *see supra*, which has repeatedly been interpreted to signify a hefty allocation of remedial discretion. *See Banco de Seguros*, 344 F.3d at 261 ("The arbitration clause . . . provided that '[t]he arbitrators shall consider this treaty an honourable engagement rather than merely a legal obligation; they are *relieved of all judicial formalities and may abstain from following the strict*

7

*rules of law.*' Courts have read such clauses generously, consistently finding that arbitrators have wide discretion to order remedies they deem appropriate.") (emphasis in original); *see*, *e.g., Harper*, 819 F.Supp.2d at 278 (citing a similar provision as warranting deference); *On Time Staffing, LLC v. National Union Fire Ins. Co. of Pittsburgh, PA*, 784 F.Supp.2d 450, 454 (S.D.N.Y. 2011) (same). Second, the Payment Agreement explains that Petersen must "deliver collateral" to National Union to secure its "Payment Obligation" (an amount that includes but is "not limited to" the payment of premiums and fees); that National Union may periodically review and alter the form of collateral it is owed; and that such collateral may be awarded by an arbitral panel. *See* Payment Agmt. at 9 ("The arbitrators may . . . order You to provide collateral . . ."). And third, the Payment Agreement's arbitration provision states plainly that if a party "fail[s] to perform or observe" its duties under the agreement, it must then "reimburse the other upon demand." *Id.* Taken together, the "essence" of the contract is that the parties agreed that (a) the arbitral panel would wield broad discretion to impose a collateral obligation to secure Petersen's duties under the contract, and (b) expenses could be shifted. The panel's award of $2 million—over $25 million less than National Union's alleged damages, to avoid a Petersen bankruptcy—to protect National Union from arbitrating its way to victory only to find Petersen unable to pay enough to offset National Union's costs, was consistent with that essence.[2]

---

[2] Petersen does not dispute, nor could it, that the panel was free to fashion a remedial amount in between the $27.5 million requested by National Union and the $0 award sought by Petersen. Arbitrators, like judges, "are not limited to resolving disputes by simply choosing between two options presented by the parties. Rather [they] are often required to use [their] judgment and to craft a different remedy." *Harper*, 819 F.Supp.2d at 277 n.12; *see Home Indem. Co. v. Affiliated Food Distributors, Inc.*, No. 96-cv-9707, 1997 WL 773712, at *3 (S.D.N.Y. Dec. 12, 1997) ("Arbitrators may grant equitable relief that a district court cannot . . ."); *ReliaStar*, 564 F.3d at 85 ("Where an arbitration clause is broad, arbitrators have the discretion to order such remedies as they deem appropriate.").

8

Nor do I see any way in which the panel ran afoul of express contractual restrictions on its power.[3] Petersen has conceded at each and every stage of this dispute that the panel was authorized to award interim security, and there is nothing in the Payment Agreement that expressly restricts the reasons upon which the panel can base its affixing a security amount. It was thus well within the panel's discretion to guard against a National Union Pyrrhic victory. *See National Union Fire Ins. Co. of Pittsburgh, PA v. Source One Staffing LLC*, 16-cv-6461, 2017 WL 2198160, at \*2 (S.D.N.Y. May 17, 2017) ("[G]iven Source One's undisputed financial difficulties, . . . the arbitration panel acted well within its authority to take steps to ensure that any final award would not be rendered meaningless."); *On Time Staffing*, 784 F.Supp.2d at 455 ("[T]he Panel, in the absence of language in the arbitration agreement expressly to the contrary, possesses the inherent authority to preserve the integrity of the arbitration . . . [by] requiring the posting of pre-hearing security. . . . Otherwise, an arbitration panel with a well-founded concern that a party was financially unable to satisfy an eventual award would have no recourse to protect itself against the risk that its significant expenditures of time and effort would be for naught"); *British Ins. Co. of Cayman v. Water Street ins. Co.*, 93 F.Supp.2d 506, 516 (S.D.N.Y. 2000).

In pursuit of a contrary result, Petersen contends that the panel violated § 10(a)(4) because the Payment Agreement requires collateral to "secure [the] Payment Obligation" and the Payment Obligation and accompanying Schedule do not expressly designate the costs and fees of

---

[3] For this reason, the cases to which Petersen attempts to analogize, *see* Pet. at 7-8, are readily distinguishable. Each of these cases involved clear-cut instances of an arbitral award rendered in violation of a contractual limitation. *See, e.g., Katz v. Feinberg*, 290 F.3d 95, 98 (2d Cir. 2002) (panel award calculating certain share prices vacated because underlying contract committed this valuation duty to company accountants and explicitly stated that the accountants' determination would "not be subject to any . . . arbitration"); *187 Concourse Assocs. v. Fishman*, 399 F.3d 524, 527 (2d Cir. 2005) (panel award that (a) found "just cause" for company to terminate employee, and (b) ordered that the employee nonetheless be reinstated to his job, vacated because the underlying contract explicitly allowed for the company to discharge employees for "just cause"). Here, by contrast, the prehearing award "does not violate any explicit provision of the contract itself." *Harper*, 819 F.Supp.2d at 280.

9

arbitrating. *See* Pet. 5-6, 9. As an initial matter, the definition of "Payment Obligation" states that while the term "include[s]" several enumerated obligations, the term is "not limited to" these enumerations. *See* Payment Agmt. at 4. So, even under the strict reading Petersen proffers, the Payment Obligation could (at least arguably) correctly be understood to encapsulate the expense-shifting summarized elsewhere in the contract. But on top of that, the more glaring problem for Petersen is that neither the Payment Agreement nor arbitration principles generally tolerate the type of formalist interpretation Petersen seeks. Quite the opposite: courts are to uphold an award if the arbitrator "is even arguably construing or applying the contract" and if the arbitrator has "even a barely colorable justification for the outcome reached." *187 Concourse*, 339 F.3d at 526 (quotations omitted). That is to say nothing of the Payment Agreement's instruction here for the arbitrators to be free of "all judicial formalities" and "strict rules of law" and to, instead, try their best to "effect the general purpose of th[e] Agreement." Payment Agmt. at 9.

The oral argument before the panel, considered with the parties' submissions in connection therewith, make clear that the arbitrators felt a justifiable tension between invoking their authority to require that Petersen pay an interim security award, on the one hand, and Petersen's acute risk of bankruptcy, on the other. And so the panel staked out a middle ground, ordering an award small enough to minimize the risk of Petersen's collapse (indeed, as noted *supra*, an award $25 million smaller than was sought) but large enough to avoid the distasteful result of National Union succeeding in an arbitration only to suffer a net loss due to costs.

Even assuming that attorneys' fees and costs are not included in the "Payment Obligation," it is *at least* arguable that the panel reached the $2 million award-amount not as *per se* reimbursement for fees and costs, but as a rough metric to enforce the "general purpose" of the Payment Agreement's requirement for Petersen to supply collateral to secure its contractual

10

duties. *Cf. Harper*, 819 F.Supp.2d at 280 ("LMCs suggest that the prepayment . . . requires them to make payments for claims not covered by their underlying policy and therefore materially alters the terms of the parties' contract. This is not accurate. The protocol simply requires that the LMCs will front 75% of the money while disputed payments are resolved. If it turns out that the policy is not involved, LMCs will recoup their money . . .") (quotations omitted). This was reasonable, and far from the panel "materially rewr[i]t[ing] the contract." *Id.*

## Conclusion

For the foregoing reasons, Petersen's petition to vacate the prehearing arbitral award is denied and National Union's cross-petition to confirm the award is granted. One final matter remains: The Court previously denied Petersen's motion to seal certain documents filed (or to be filed) in connection with this case, *see* Order, ECF No. 14, but there are several filings on the docket that still contain redactions. Especially given that this order "relies on (indeed, discloses) much of the redacted content, which heightens the basis for public access," *National Union Fire Ins. Co. of Pittsburgh, PA*, 2017 WL 2198160, at *3, Petersen shall, within one week of the issuance of this order, file unredacted versions of the applicable documents (ECF Nos. 1, 7 (with attachments), 8) on the docket. The Clerk shall terminate the open motions (ECF Nos. 1, 16). As there is no reason to keep the matter open pending arbitration, the Clerk is directed to close this case without prejudice to either party moving by letter to reopen the case within 30 days of the conclusion of the arbitration proceedings.

SO ORDERED.

Dated:     February //, 2020
           New York, New York

ALVIN K. HELLERSTEIN
United States District Judge

11